## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

| | | |
|---|---|---|
| BRITTNEY WILSON and SHAMEKA WILSON  as of next of kin of RANDAL WILSON, and BRITTNEY WILSON as ADMINISTRATOR OF THE ESTATE OF RANDAL WILSON, deceased, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. |
| vs. | ) ) ) | NO. 5:24-cv-00205 |
| WRCH TRANSPORT, INC., NAVNEET SINGH, and SECURITY NATIONAL INSURANCE COMPANY, | ) ) ) ) | JURY TRIAL DEMAND |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AND MEMORANDUM IN SUPPORT THEREOF

Defendants hereby move to enforce the binding settlement agreement the parties reached on March 4, 2025. Despite Plaintiffs' counsel's express acceptance, which appeared in a letter sent to Defendants under the document name, "Wilson Acceptance Letter," they have since elected to renege for the sole purpose of setting up a bad-faith claim. To do so, Plaintiffs' counsel has tried to frame the document they themselves named the "Wilson Acceptance Letter" as a **counteroffer**.

1

Despite Plaintiffs' counsels' efforts to engage in semantic manipulation, the law prevents them from undoing this deal. Plaintiffs' counsel is instead bound by the objective meaning of the words they wrote in their "Wilson Acceptance Letter." Indeed, because Plaintiffs' counsel gave an objective manifestation of their clients' assent to all essential terms of the settlement, the parties' deal is valid and binding, and Defendants ask this Honorable Court to enforce it for several reasons:

First, this settlement should be enforced because, in the aptly named "Wilson Acceptance Letter," Plaintiffs' counsel did in fact accept the settlement offer on the table and promised to perform under the agreement using one of the acceptable means Defendants offered them: the execution of a limited release. Second, this settlement should be enforced because the Wilson Acceptance Letter was not rendered a counteroffer by opposing counsel's precatory request for payment by March 7th. Third, even assuming arguendo that the Wilson Acceptance Letter could be construed as a counteroffer, which Defendants strongly dispute, this settlement should be enforced because Defendants accepted its terms immediately.

## PROCEDURAL HISTORY AND STATEMENT OF MATERIAL FACTS

### *Parties and Underlying Claims*

This case arises out of a May 2024 collision between Defendant WRCH Transport, Inc. ("WRCH") and Plaintiffs' decedent, Randal Wilson, who was tragically killed in the crash.  Defendant Security National Insurance Co., Inc. ("Security National") is the motor carrier liability insurer of WRCH, who employed Defendant Navneet Singh ("Singh"), the driver. Plaintiffs filed suit on June 28, 2024, alleging wrongful death and estate claims.[1]

### *Security National's Initial Offer (December 11, 2024)*

Before Plaintiffs' counsel disclaimed the deal they struck in the Wilson Acceptance Letter, the parties had been involved in settlement discussions dating back to December 11, 2024. On that date, despite the fact Plaintiffs had not yet demanded the applicable insurance limits, Defendants offered to settle the case for the $1,000,000 limits of the policy issued by Security National (the "December Offer"). (Ex. A); [Initial Disclosures of WRCH, Attachment E (stating policy limits)].

---

[1] Answers were filed as follows:  Security National (August 8, 2024 [Doc. 7]); Singh (August 21, 2024 [Doc. 9]) and WRCH (December 23, 2024 [Doc. 26]).

### *Plaintiffs' First Demand (January 23, 2025)*

In response to the December Offer, Plaintiffs sent a demand letter to Defense counsel by certified mail on January 23, 2025, for $2,000,000 (the "January Demand"). (Ex. B). Plaintiffs' counsel attempted to justify the dollar amount they sought by arguing, incorrectly, that the applicable policy limits were in fact $2,000,000. Plaintiffs took the position that the tractor and trailer were subject to their own independent insurance limits of $1,000,000 each. The January Demand explicitly cited to *Southern Gen. Ins. Co. v. Holt*, 262 Ga. 267 (1992), and stated it would expire after a "period of 30 days." Finally, this January Demand also indicated Plaintiffs would agree to sign an enclosed Limited Liability Release.

### *Security National's Second Offer (February 21, 2025)*

Security National (through its authorized administrator, AmTrust North America, Inc.) responded to Plaintiffs with a second offer on February 21, 2025 (the "February Offer"). Therein, Security National rejected the January Demand, reiterated that the insurance policy limits were $1,000,000, again offered $1,000,000, and sought "a full and final settlement of your clients' claims against WRCH Transport, Navneet Singh and Security National." (Ex. C).

4

### *The Wilson Acceptance Letter (March 4, 2025)*

On March 4, 2025, at 2:50 p.m., Plaintiffs accepted the February Offer in a letter sent by email to Security National (with a copy to Defense counsel, Elizabeth G. Howard). (Ex. D). As discussed above, this letter was saved in a PDF file that opposing counsel titled: "Wilson Acceptance Letter." (Ex. E).

The Wilson Acceptance Letter specifically referenced the February Offer and indicated that: "[w]e are authorized to accept that offer on behalf of our clients subject to the terms of the attached limited liability release." The letter then went on as follows:

> Please make the settlement check payable to Brittney and Shemeka Wilson, as Next of Kin of Randal Wilson, and attorneys Katherine L. McArthur, LLC. Our clients will satisfy any and all legally and enforceable liens out of the settlement proceeds. Payment shall be delivered to our Macon office by Friday, March 7, 2025 by 12:00 p.m. Our firm's tax-id number is . . . Please let us know when we can expect the settlement check.

Unlike the January Demand, the Wilson Acceptance Letter did not cite to *Holt.* Nor did it cite O.C.G.A. § 9-11-67.1. Furthermore, it was not sent by certified mail or by statutory overnight delivery. And while Plaintiffs' counsel now contends the Wilson Acceptance Letter was not actually an acceptance, the letter did not state anywhere that it was a "counteroffer" or a "demand."

At 3:31 p.m., Howard emailed Plaintiffs' counsel in response to their letter, stating: "Please send us a W9." (Ex. F). Howard emailed again at 3:32

5

p.m., indicating: "we can send directly to you if you will send us your FedEx account number."   (Ex. G). At 3:39 p.m., Plaintiffs' counsel responded to Howard—**not** by stating the parties did not yet have a settlement—but by sending the W-9 and adding that her office manager would provide the FedEx information.   The office manager sent the FedEx account information to Howard at 3:40 p.m.  (Ex. H).

At 3:42 p.m. Howard sent a third email to counsel, saying: "We are going to work on getting you the check as soon as we can, but Friday March 7 is simply not possible." (Ex. I). In the same email, Howard stated that Defendants wanted to add Wesco Ins. Co. to the release. As three individuals (Howard, a claims administrator, and a Wesco representative) have expressly indicated, Howard's request pertaining to Wesco was a mistake. (Ex. J, K, L). Despite this mistaken request, Howard concluded her email by saying: "I am glad we were able to resolve this matter." Plaintiffs' counsel wrote back at 3:53 p.m. and said the following: first, that March 7th was "more than reasonable"; second, that Plaintiffs would not release additional parties; and third, that: "we will resolve this case for the limited release previously sent to you with the check being received by Friday" (the "3:53 E-mail"). (Ex. M).

Plaintiffs' counsel then sent another e-mail at 4:30 p.m., indicating she did not want to proceed under the parties' agreement: "given your request for

additional released parties, we cannot move forward with a settlement at this time" (the "4:30 email"). (Ex. N). Plaintiffs' counsel went on to write: "we need to determine the involvement of Wesco and why they have not previously been disclosed in your Corporate Disclosure or your Initial Disclosure as having a financial interest in this case." Howard immediately responded at 4:31 and 4:35 p.m., saying that the request to add Wesco was a mistake, that Security National was the only insurer, and that Defendants would move forward with the limited liability release as originally proposed. (Ex. J).

Sensing a chance to declare bad-faith, Plaintiffs' counsel did not respond to Howard's 4:31 and 4:35 p.m. emails. Nor did Plaintiffs' counsel respond to Howard's 5:21 p.m. email, which asked for an explanation of Plaintiffs' position on the settlement and repeated that the request to add Wesco to the release had been a mistake. (Ex. O). Instead, Plaintiffs' counsel sent a spoliation letter and a request to Wesco under O.C.G.A. § 33-3-28. (Ex. P, Q).

Defense counsel sent additional correspondence to Plaintiffs on March 6, reaffirming her clients' commitment to the settlement agreement, and confirming that the Wilson Acceptance Letter's limited release was a valid way for Plaintiffs to resolve their claims. Specifically, Howard wrote:

> [w]e are providing the settlement check to your office according to the instructions and deadline you stated in your letter. We agree to accept the terms set out in the Limited Release you provided. As

> discussed, Wesco Ins. Co. is not the insurer and should not be
> included in the Release. The request for Wesco to be included was
> an error. Wesco is not involved in any way in this matter."

(Ex. R). The settlement check was sent by separate cover and was received by March 7, 2025. (Ex. S).

Plaintiffs responded to the March 6 letter by stating the parties never had a deal and indicating Defendants failed to accept the alleged "counteroffer" contained in the Wilson Acceptance Letter by "demanding" to add parties to the release, rejecting the Friday payment deadline, and stating the check would not be sent until the release was signed. (Ex. T).

Despite Plaintiffs' counsel's March 6th contention that the parties had no settlement, they retained the settlement check until March 27. After taking these twenty days to consider their position, Plaintiffs returned the check with a March 27 letter, which gave "final confirmation of [Defendants'] rejection of our good faith offer to resolve this case. . . ." Plaintiffs also proclaimed that, a result of this "rejection," Security National was now exposed to any excess judgment. (Ex. U).

## ARGUMENT AND CITATIONS TO AUTHORITY

### 1. Standard of Review

Federal law allows a district court sitting in diversity to summarily enforce a settlement agreement, including by making findings of fact. *See Ford v. Citizens and Southern Nat. Bank, Cartersville*, 928 F.2d 1118, 1121 (1991); *Adams v. Equifax Information Services, LLC*, No. 1:22-CV-04792-SEG-RDC, 2023 WL 7458848, at *3 (N.D. Ga. Oct. 6, 2023). This is in contrast with Georgia procedure, which does not allow the trial court to resolve factual disputes. *See Adams*, 2023 WL 7458848, at *3.

Substantively, Georgia law favors compromise, and thus settlements will be upheld "whenever possible." *Am. Academy of Gen. Physicians, Inc. v. LaPlante*, 340 Ga. App. 527, 530 (2017); *see also Francis v. Chavis*, 245 Ga. App. 641, 643  (2018); *Tillman v. Mejabi*, 331 Ga. App. 415, 417 (2016). Accordingly, courts should "enforce settlement agreements **unless** it appears that the parties clearly failed to reach agreement on an essential contract term." *Ruskin v. AAF-McQuay*, 284 Ga. App. 49, 52 (2007) (emphasis added).

A settlement agreement, like any other contract, is formed by a "definite offer and complete acceptance, for consideration." *Moreno v. Strickland*, 255 Ga. App. 850, 852 (2002); *see also Ruskin*, 284 Ga. App. at 5; O.C.G.A. § 13-3-

2. Under O.C.G.A. § 9-11-67.1(a), "any" settlement offer in a personal injury auto accident case, no matter when it is sent, is an offer to enter a bilateral contract. Accordingly, such offers need not be accepted by performance; a manifestation of mutual assent is all that is necessary. *See Herring v. Dunning*, 213 Ga. App. 695, 698-99 (1994).

To assess whether the parties have given mutual assent, courts apply an objective theory of intent in which "one party's intention is deemed to be that meaning a reasonable [person] in the position of the other contracting party would ascribe to the first party's manifestations of assent." *Terry Hunt Const. Co., Inc. v. AON Risk Servies, Inc.*, 272 Ga. App. 547, 551-52 (2005) (relying on extrinsic evidence, including correspondence).

### 2. Plaintiffs' March 4 Letter Accepted Security National's February Offer, Forming a Settlement Agreement.

#### a. The February Offer Allowed for a Limited Release.

Security National made a settlement offer on February 21, 2025, which Plaintiffs unequivocally accepted in their March 4th "Wilson Acceptance Letter." As stated above, this settlement agreement was the culmination of negotiations that began with the December 2024 Offer. In the December Offer, Defendants offered the $1,000,000 limits in exchange for a "full and final release of all claims and a dismissal." The January 2025 Demand insisted the

subject policy limits were in fact $2,000,000 and demanded that amount in exchange for a limited liability release.

In the February 2025 Offer, Security National reiterated its prior offer of $1,000,000, explained this amount represented the applicable limits, and abandoned the request for a general release—seeking instead only a "full and final settlement." *See Tillman*, 331 Ga. App. at 416 (demand seeking "full and final settlement of this matter" allowed either general or limited release, so contract arose when offeree "accepted" and provided general release); *Herring*, 213 Ga. App. at 698-99.

### b. The Wilson Acceptance Letter Was Not a Counteroffer

In the Wilson Acceptance Letter, Plaintiffs' counsel agreed to all essential terms of Security National's February Offer and specifically stated the offer was being accepted with client-authorization. Where an offeree manifests her intent to be bound on all essential terms, a binding contract is formed. *See Capitol Materials, Inc. v. Kellog & Kimsey, Inc.*, 242 Ga. App. 584, 586-87 (2000); *see also Baldwin v. Adams*, 306 Ga. App. 104, 104 (2010) (binding settlement where counsel's words went beyond merely indicating client's authorization, and in fact made an offer, by stating: "I am authorized to say that if your client will offer $17,500.00 . . . my client . . . will accept it.").

11

Moreover, any failure to agree upon non-essential terms cannot invalidate an otherwise valid contract. *See Newman v. Newman*, 291 Ga. 635, 636 (2012); *Goobich v. Waters*, 283 Ga. App. 53, 56 (2006); *Kreimer v. Kreimer*, 274 Ga. 359 (2001). Thus, a counteroffer only arises "[w]here one party makes an offer and the other party purports to accept that offer, but with *material changes in terms*." *Crystal Cubes of Stone Mountain, Inc. v. Kutz*, 201 Ga. App. 338, 338-39 (1991) (valid acceptance of an offer seeking performance on specific date, where a party "accepted" on said date, but indicated they could not perform until the following day); *see also Steele v. Steele*, 298 Ga. 548 (2016).

Even if an offeree's acceptance **does** suggest material alterations, a contract still arises unless the acceptance is expressly conditioned on the proposed changes. *Compare Herring v. Dunning*, 213 Ga. App. 695, 698-99 (1994); *Turner v. Williamson*, 321 Ga. App. 209, 213-14 (2013); *with Anderson v. Benton*, 295 Ga. App. 851, 853-55 (2009) (counteroffer where counsel stated they would only release personal injury claims, and opposing counsel extended an offer that was "contingent" on release of additional claims).

Finally, "[i]f an offer contains alternative propositions, the party receiving the offer may elect between the alternative propositions." O.C.G.A. § 13-3-3; *Herring*, 213 Ga. App. at 698-99 ("Since plaintiff's offer contained no specified manner of acceptance, defendant's counsel was entitled to accept by

mailing the insurer's promise to pay the policy limits in exchange for a full release"); *see also Tillman v. Mejabi*, 331 Ga. App. 415, 416-17 (insurer accepted offer of the policy limits in exchange for "full and final settlement" by letter indicating acceptance, which enclosed the check and a general release "for your client's signature. Please keep the settlement money in your trust account until the Release is signed and returned to this office.").

### i.    A valid contract was formed when Plaintiffs agreed to execute a limited release.

Here, Plaintiffs elected to accept Security National's settlement offer by agreeing to one of the acceptable manners of performance contained in the February Offer: a limited release. Just as in *Herring* and *Tillman*, the February Offer sought a "full and final **settlement**" in exchange for insurance limits. In both cases, the plaintiffs' offers used the same language, yet a meeting of the minds still occurred where the defendants indicated they would "accept" in exchange for a full and final release.

The only meaningful difference between the two foregoing cases and the instant matter is that, here, the **Plaintiffs** were the offerees, and it was **their** acceptance that expressed a desire to settle under the terms of a specific type of release—yet this fact makes Defendants' case stronger. In this case, Plaintiffs themselves had the option to elect between multiple contractual

duties that **they** would perform under the settlement agreement. Indeed, Defendants' offer was "silent as to the particular form" by which the Plaintiffs would "terminate the controversy"—thus, Plaintiffs had the right to elect between the possible alternatives. *See* O.C.G.A. § 13-3-3; *Herring*, 213 Ga. App. at 698-99; *Woolbright v. Sneed*, 5 Ga. 167, 170 (1848) (where an offer contains alternative propositions, the offeror is bound when an offeree elects between them). That is exactly what Plaintiffs did: accepting the $1,000,000 offer in exchange for their promise to execute a limited release.[2]

Importantly, the Wilson Acceptance Letter created a final, binding settlement agreement **before** Defense counsel's request to release additional parties. Thus, to the extent this subsequent request was inconsistent with the terms of the settlement, there would only be an issue of compliant performance—which would **not** impact the deal's formation. *See Mealer v. Kennedy*, 290 Ga. App. 432, 436 (2008) ("since the agreement to terminate the controversy already had been created, the defendant's subsequent proffer of a release form which plaintiff believed was not in compliance with the understanding of the parties would not be a rejection of the previously accepted offer.").

---

[2] An offer to "settle" which does not specify a particular type of release involved remains sufficiently definite to allow for acceptance. *See Herring*, 213 Ga. App. at 698.

14

### ii.    Plaintiffs' request for payment by March 7 was not a material term.

Additionally, Plaintiffs' acceptance was not conditioned upon their request to receive payment by noon on Friday March 7, 2025. Rather, Plaintiffs made this request with merely "precatory language"—communicating only expectation or entreaty. *Compare Turner v. Williamson*, 321 Ga. App. 209, 212, 738 S.E.2d 712, 715 (2013); *Herring v. Dunning,* 213 Ga. App. 695, 699, (1994); *with Anderson*, 295 Ga. App. at 853-55 (2009)

The "precatory" nature of Plaintiffs' request is clear when read in the context of the Wilson Acceptance Letter. With respect to the two-and-a-half day payment, Plaintiffs' use of the word "shall" does not change that outcome. The Georgia Supreme Court "has recognized that, though 'shall' generally indicates a mandatory directive, it can be permissive depending on the context in which it appears." *State v. Islam*, 912 S.E. 2d 632, 636 n.2 (2025); *see also Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (Ginsburg, J.) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuses, 'shall' to mean 'should,' 'will,' or even 'may.'").[3]

---

[3] For a thorough discussion of the context-dependent nature of the word "shall" in legal drafting, *see Bland Henderson v. Commonwealth*, 77 Va. App. 250, 257-62 (2023).

The first piece of relevant context is Plaintiffs' explicit "acceptance" of Security National's offer. Indeed, Plaintiffs saved their letter with the title "Wilson Acceptance Letter," and sent it to Defense counsel under that same name. Moreover, the text of the letter itself indicated an express "acceptance" of the February Offer. A reasonable person in Defense counsel's position would believe Plaintiffs' experienced attorneys had in fact intended this "acceptance" to form a legally binding contract. *See Mealer v. Kennedy*, 290 Ga. App. 432, 433-37 (2008) (enforcing contract where evidence showed plaintiff's counsel attempted to set up a bad-faith claim, stating: "[w]e emphasize [the plaintiff's] attorney himself wrote to [the insurer] characterizing [the insurer's] response as an *acceptance*."); *Terry Hunt Const. Co., Inc.*, 272 Ga. App. at 551 (2005). Thus, a reasonable person would also interpret the term "shall" as mere entreaty, rather than as an additional material term that Security National had to accept before the parties had a deal. Even if the letter **was** intended to set up a bad-faith claim by creating a counteroffer, Plaintiffs' choice to objectively manifest assent by indicating "acceptance" in the letter's title and text should be construed against them. *See Mealer*, 290 Ga. App. at 433-37.

The next piece of relevant context appears two sentences after Plaintiffs' request for payment. In the Wilson Acceptance Letter's closing sentence, Plaintiffs' counsel asked: "Please let us know when we can expect the

settlement check." Here, Plaintiffs implied their belief that Defendants **would** be sending a check under the parties' agreement—and further that, despite their request for payment by noon on March 7, Plaintiffs **did not know** if it would arrive by then. There would have been no need to ask this question if the receipt of payment in two-and-a-half days was a material condition of the settlement. This context shows, therefore, that the parties were in agreement on all material terms.

Accordingly, (1) Plaintiffs manifested an intent to "accept" the February Offer; (2) Plaintiffs' acceptance was valid because the February Offer allowed for a limited release; and (3) Plaintiffs' request for payment by March 7 did not give rise to a counteroffer. Thus, the parties had a binding settlement.

### 3. To the Extent the "Wilson Acceptance Letter" is Construed as a Counteroffer, Defense Counsel Immediately Accepted it

Alternatively, and to the extent that the Wilson Acceptance Letter is construed only as a counteroffer, Defendants nonetheless manifested their assent to it. Following her receipt of Plaintiffs' letter, Defense counsel proceeded in a manner objectively showing she understood a binding settlement agreement was in place. At 3:31 p.m., Defense counsel demonstrated performance was underway—taking the first step toward issuing the check by requesting Plaintiffs' W-9. One minute later, Defense

17

counsel followed up with explicit confirmation of this intent to perform: "And we can send directly to you if you will send us your fed ex account number." Plaintiffs' counsel thus observed that Defendants had assented and intended to be bound. *See Baldwin*, 306 Ga. App. at 104; *Mealer*, 290 Ga. App. at 433-37; Restatement Second of Contracts §§ 19, 62. Then, in two emails from 3:39-3:40 p.m., Plaintiffs' counsel affirmed **their own** understanding that the parties were operating under a binding deal by sending the W-9 and FedEx account number.

Doubtlessly, Plaintiffs will point to Defense counsel's subsequent 3:42 p.m. email in an attempt to argue there was no settlement. But **even there**, Defense counsel concluded by **reaffirming** her understanding that the deal was in place: "I am glad we were able to resolve this matter." The 3:42 p.m. email also demonstrated Defense counsel's unambiguous intent to do everything possible to send the check by March 7 at noon: "**We are going** to work on getting you the check as soon as possible." (emphasis added). The subsequent claim, that it was "simply not possible" was, at worst, a futile attempt to renegotiate a binding term of the contract. *See supra* at p. 15; *Mealer*, 290 Ga. App. at 436. Otherwise, it represented only further bargaining over a non-essential term, following the formation of the contract. *See* O.C.G.A.

§ 9-11-67.1(c); *Kreimer*, 274 Ga. at 362 (contract formed despite lack of agreement on immaterial term).

In the same way, Defense counsel's request that Plaintiffs' counsel add parties to the release was, at best, an unfortunate mistake that was corrected as soon as Plaintiffs' counsel pointed out that Wesco had no disclosed financial interest. At worst, this request was a futile attempt to bargain over already-binding terms. *See supra* at p. 15; *Mealer*, 290 Ga. App. at 436. Further, nothing in the March 4 letter addressed whether the release had to be signed before payment. Thus, any comment on the order of signing and payment was no rejection. *See supra* at p. 15; *Mealer*, 290 Ga. App. at 436.

Moreover, Plaintiffs' counsel's March 6 email was the first time they argued a settlement agreement was not in place. Though the 4:30 pm email of March 4 stated Plaintiffs could not "move forward with a settlement at this time," this was no more than a request for additional time before executing the release, in light of the purported need to "determine the involvement of Wesco." Plaintiffs' counsel refused to respond when Defense counsel asked in a 5:21 p.m. email: (1) if they intended to disregard the agreement, and (2) what information they wanted to confirm. Whether Plaintiffs' request for more time complied with the deal's terms is a separate question from whether the deal was in place. *See supra* at p. 15; *Mealer*, 290 Ga. App. at 436.

Finally, Plaintiffs suffer no prejudice in the enforcement of the settlement agreement. First, they accepted the terms of the agreement in the Wilson Acceptance Letter. Second, even Plaintiffs knew that the inclusion of Wesco was a mistake, as they had sued Security National directly as the insurer, the parties admitted that Security National was the insurer, and the only insurer identified in discovery and in court disclosures was Security National.

## **CONCLUSION**

The Court should grant the Motion to Enforce the March 4 settlement agreement entered into between Plaintiffs and Defendants.

Respectfully submitted this 27th day of May 2025,

> LEVY PRUETT CARTER
>
> /s/ Elizabeth G. Howard
> Elizabeth G. Howard
> Georgia Bar No. 100118
> *Attorney for Defendants*

125 Clairemont Ave.
Suite 410
Decatur, GA 30030
Direct:      404-538-1225
Office:      404-371-8857
Fax:         404-371-8882
gg@levypruettcarter.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served the foregoing **Motion to Enforce Settlement** by using the CM/ECF system, which will automatically send e-mail notification of such filing to the following parties:

Katherine L. McArthur, Esq.
Jessica A. Edmonds, Esq.
Quintesha S. Reynolds, Esq.
McArthur Law Firm
6055 Lakeside Commons Dr Ste 400
Macon, GA 31210
kmcarthur@mcarthurlawfirm.com
qreynolds@mcarthurlawfirm.com
jedmonds@mcarthurlawfirm.com
*Attorneys for Plaintiffs*

This 27th day of May 2025.

LEVY PRUETT CARTER

*/s/ Elizabeth G. Howard*
Elizabeth G. Howard
Georgia Bar No. 100118
*Attorney for Defendants*